# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CP-01270-COA

SHARON A. EDWARDS                                           APPELLANT

v.

JANET A. WILLIAMS AND LAURIE PANNELL              APPELLEES

DATE OF JUDGMENT:              01/11/2018
TRIAL JUDGE:                  HON. C. MICHAEL MALSKI
COURT FROM WHICH APPEALED:    UNION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       SHARON A. EDWARDS (PRO SE)
ATTORNEYS FOR APPELLEE:       JANET WILLIAMS (PRO SE)
                              JOE M. DAVIS (FOR JANET WILLIAMS)
                              SAM C. MARTIN (FOR JANET WILLIAMS)
NATURE OF THE CASE:           CIVIL - REAL PROPERTY
DISPOSITION:                  REVERSED AND RENDERED IN PART;
                              REVERSED AND REMANDED IN PART -
                              11/26/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McCARTY AND C. WILSON, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     One set of landowners filed suit for trespass against their neighbors. The neighbors counterclaimed for adverse possession, asking for a stretch of land right by their house where their new fence and patio had been built. The chancery court found that adverse possession was established and dismissed the claim for trespass and damages.

¶2.     On review, we determine that two of the elements of adverse possession were not met—that the use of the disputed property was not open, notorious, and visible and that it was not hostile. Consequently, we reverse and render the finding of adverse possession; we

further reverse and remand to halt the ongoing trespass and to determine if damages should be awarded.

*Background*

¶3. For the most part, the facts of this now years-long legal battle are not in dispute. The property in question is situated on three adjoining lots in Union County. Once upon a time three school buildings were on this property—one on each lot, together called the Center School.

¶4. Lots 3 and 2 were owned by Mr. and Mrs. Purvis. The Purvises bought the two lots circa 1968. They lived in one of the former school buildings located on Lot 3. By that time, the school building on Lot 2 had collapsed.

¶5. So Lot 2 was used for other things, like housing a dog pen Mr. Purvis built around the time they moved to the property. The dog pen was composed of metal stakes with wire strung between them. Mr. Purvis also had several little outbuildings on Lot 2, including a smokehouse. Mr. Purvis and his brother would drive up the far side of Lot 2 to the back of the dog pen, with time and tires carving the dual ruts of a narrow dirt road.

¶6. The Purvises did not own Lot 1. Like Lot 3, Lot 1 had a former school building on it that was used as a residence.

¶7. The Purvis children, Dianne and Rickey, both moved out of Mississippi after reaching adulthood. Mr. Purvis passed in 2000. Mrs. Purvis moved away to live with Dianne in 2008 when her health began to decline, and she passed in 2012.

¶8. As Dianne later described, they had a memorial back home in Union County for her

2

mother in late 2012. When she and her brother came back to the old home place, they saw that a new fence was put up by their neighbors on Lot 1. "When we got there, it was a shock," she remembered—because the new fence line encompassed a section of Lot 2, which her parents had owned for decades. Dianne also noticed that the smokehouse and other outbuildings her father had put up were completely gone—the area had been bulldozed down into the hollow that rested behind the old school. She believed apple trees and some shade trees were also knocked down.

¶9.     As a result, Dianne and Rickey sued the owners of Lot 1 for trespass and damages for the loss of the trees and the outbuildings. They filed suit in 2016, four years after discovering that the fence was put up and the property bulldozed.

¶10.    The owner of Lot 1 counterclaimed. Janet Williams asked the chancery court to declare that she owned the part of Lot 2 where the new fence was put, alleging she had acquired it through adverse possession. The counterclaim was filed October 5, 2016, meaning at trial she would have to prove the elements of adverse possession dating back to at least 2006.

¶11.    What Williams specifically requested was the strip of land running down the side of the house. Just as Mr. Purvis had, the folks on Lot 1 had been using the little road he had cut as a driveway on Lot 2 to get to the back of their property. After bulldozing the strip bordering Lot 1 and Lot 2, they put down gravel on the side of their building for a patio, and then they put up a new fence further onto Lot 2, using the same boards as their original fence.

3

¶12.    One of the neighbors, Rose Mathis,[1] explained that the new fence was built where she said there had previously been a "wire fence."  She knocked down the wire fence when bulldozing.  Rose put the new fence back up where the wire fence was, and she maintained during parts of the trial that this was the "real" property line.

¶13.    Dianne countered that the wire fence was not part of a fence line—that it was the remnant of the dog pen where her father and uncle kept their rabbit dogs.  "It was strictly for his dog pen," she swore.

¶14.    But it was this disputed stretch of gravel—a few feet off the building on Lot 1 stretching into Lot 2, with a fence put up on it—that is the heart of the dispute.

*The Trial*

¶15.    By the time of trial, ownership of Lots 3 and 2 had transferred to Sharon Edwards, a first cousin of Dianne and Rickey.  The chancery court heard testimony from Dianne, Sharon, Rose, and another person who lived in the house on Lot 1, Laurie Pannell.  The chancery court also visited the property in dispute.

¶16.    Dianne explained why the trespass action was brought.  She testified that Rose had called her a few years before, in 2012, complaining that Lot 2 had become very overgrown.

---

[1] The ownership of Lot 1 is more intricate than the Purvises' clear claim to Lots 3 and 2.  For purposes of this appeal, it matters only that in November of 2003, Lot 1 was deeded to Ricky Pannell.  During trial, Rose claimed that she actually owned the property and that Ricky was only sixteen years old at the time; nonetheless, her name is not on the deed.  In 2007, Ricky deeded the property to Rose.  A complex series of transfers between various people ultimately vested title in Janet Williams, who has full title to Lot 1, but did not testify at trial.  According to her uncontested testimony, Rose paid for the house and has a life estate in the land; she carried the weight of the claim for adverse possession as the primary witness at trial.

Once Mrs. Purvis moved away, no one was tending to the property, and Rose told her snakes were becoming a problem.

¶17. According to Dianne, Rose asked for permission to weed-eat "around that old dog pen fence" that her father had built on Lot 2. After checking with her brother, they gave Rose permission to clean up that part of Lot 2. However, Dianne was adamant she did not give Rose permission to bulldoze the area or knock down buildings.

¶18. Rose recalled the conversation slightly differently. She believed that she had gotten permission from Dianne to do this and testified they discussed Rose using a bulldozer to clear up Lot 2. Because Rose said a "weed eater would not have got that down" because Lot 2 had grown up so much. Both agreed that Rose had called and asked for permission before entering the land.

¶19. Rose maintained she did not intentionally try to damage anything on Lot 2. She remembered Dianne had told her she was okay with a "clean up" but to not cut down trees. In Rose's words, she told Dianne, "I will not touch a tree."

¶20. Rose then put on her case whether the strip of Lot 2 was adversely possessed. Under questioning from the chancery court, Rose admitted that when she moved to the property in 2003, she had not had a survey done.[2] They had "just started cleaning it up and it was a total wreck . . . . You couldn't even see a [property] line or anything." But Rose was ambivalent whether she thought in 2003 that the disputed stretch of property on Lot 2 belonged to the

---

[2] To be precise, Rose was not on the deed for the property in 2003. It was in the name of Ricky Pannell. Her testimony was that she was a truck driver, and her attorney "suggested to put everything in somebody else's name because I don't know what's going to happen from one day to the other while I'm on the road."

Lot 1 property owner.

¶21.   She told the court that at the time she moved in she believed Lot 1 encompassed the property up to the "wire line"—the dog fence.  She explained she used the old dirt road Mr. Purvis had made to get to the back of her property—and that without it, she could not drive her truck behind her house.

¶22.   However, Rose clarified that as early as 2004 she was told the strip of land was not part of the property.  In cleaning up Lot 2, which she remembered contained junked cars and other debris, she was using the dirt road Mr. Purvis had used to go to the back of his dog pen.  Mrs. Purvis was outside, and the older neighbor told her "this ain't your driveway," in her words, and that it "don't go to y'all's property."  A 2006 survey commissioned by Rose—not produced at trial—confirmed what Mrs. Purvis told her:  the strip of land was not part of Lot 1, but within the confines of Lot 2.

¶23.   For her part, Dianne testified the dog pen boundaries were not even close to Lot 1—"It was way over on our property . . . way over."  She testified that she had vehemently objected to the new fence in 2012, when they came back home for her mother's memorial.

¶24.   Although Rose maintained during trial that her use of the patch of Lot 2 was not interrupted and no one had complained about her use, her own testimony repeatedly belied those talking points.  She admitted that there were multiple instances of the neighbors calling the police on one another.

¶25.   The most crucial time this happened was in 2012.  The Purvis children were back in Union County for their mother's memorial.  Rose's housemate's "nephew was here from

6

Kansas, and his car was parked on the edge of the fence[line] where the fence is now . . . like in between half and half." When Rickey saw the car parked on Lot 2, Rose remembered "Rickey had a fit, said [the car] was on his property, wanted him to move the car. And I told him, I said, We're not on your property."

¶26. Rickey then called 911. An officer arrived, and while Rose did not like it—and tried to maintain that she owned that part of Lot 2—she asked her friend's nephew to move his car.

¶27. Rose also recalled a time when she had her house on Lot 1 up for sale in 2016, and a potential buyer was looking at it. Dianne came in the house "cussing and yelling," and later Rickey also confronted her about the fence-line.

¶28. Even though she was asking for adverse possession, Rose emphasized that she only entered Lot 2 with Mrs. Purvis's permission. When her lawyer asked, "Did you ask permission before you went on the property?" Rose responded, "I did." In fact, Rose was adamant that she had *always* called Mrs. Purvis for permission, unless there had been an emergency. She recounted times helping her older neighbor after her children had moved away—helping her up from a fall, fixing a hole in her deck, or helping mow the grass. "But other than that," Rose recalled, "I do not just go over there without being asked."

¶29. Dianne agreed that Rose had called her to ask for permission to clean up the strip of land and other parts of Lot 2. Despite saying anytime she was on Lot 2 was only by permission, Rose also testified that she had always taken care of the strip of land up to the dog pen line. Dianne and Rose also both testified they had discussed buying each other

out—either Dianne buying up Lot 1, or Rose buying Lots 2 and 3.

¶30. The issue of who paid the taxes on Lot 2 also arose during the trial. Dianne testified that her family had always paid the taxes on their two lots, and Rose agreed on cross-examination that she had never paid taxes on Lot 2 or the disputed stretch of land.

*The Chancery Court's Ruling*

¶31. The chancery court issued a brief order after the trial, addressing the six prongs of adverse possession. Despite Rose's testimony that her use of the property was uninterrupted—even though her lawyer questioned her about the 2012 dispute where the police were called—the chancery court ruled that "there was no testimony that anyone had interfered with their use" since 2003. Similarly, the chancery court ruled that the Purvis family "took no action to expel them, thus the use was peaceful," and the court ultimately held that the defendants had adversely possessed the parcel at issue. The chancery court further denied the claim for trespass and damages.

¶32. The current landowner of Lots 2 and 3, Ms. Edwards, sought for the chancery court to amend its rulings, arguing in part that the chancery court "over granted" the area of adverse possession beyond what Rose and the owner of Lot 1 requested. The motion was denied, and Ms. Edwards, now pro se, appealed. The record landowner of Lot 1, Ms. Williams, also responded pro se.[3]

---

[3] While the pro se brief is signed by Ms. Williams, it is written in the first person by Rose, and the signature block beneath Ms. Williams's signature notes "C/O Rose Mathis." After her original brief was found to be in noncompliance by the Clerk, two lawyers appeared on her behalf and sought leave to file an amended brief. We denied the request since the noncompliance order from the Clerk only allowed submission for "the corrected portions of the document(s)" listed in the notice.

**STANDARD OF REVIEW**

¶33.   At trial, "[t]he party alleging adverse possession must prove each of [its] elements by clear and convincing evidence." *Warehousing Mgmt. LLC v. Haywood Props. LP*, 978 So. 2d 684, 687 (¶6) (Miss. Ct. App. 2008). On appeal, "[w]e will not reverse a chancellor's decision unless it was manifestly wrong, it was clearly erroneous, or the chancellor applied an incorrect legal standard." *Id*. at (¶14). Accordingly, "[i]f there is substantial evidence to support the chancellor's finding, we must affirm." *Id.*

**DISCUSSION**

¶34.   "There are six elements a claimant must prove to establish a claim of adverse possession." *Id*. at (¶16). To meet the high burden of clear and convincing proof, a party has to show property possession "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Id*.

¶35.   Ms. Edwards specifically challenges the chancery court's findings on the elements of claim of ownership; whether the actions were actual or hostile; whether the possession was open, notorious, and visible; and whether they were continuous for a period of ten years.

¶36.   After a thorough review of the record and transcript of the trial, including exhibits, we focus on two issues: whether the possession was open, notorious, and visible, and whether it was hostile. Finding those two elements were not met, we reverse and render the determination of adverse possession. As reversal impacts the current fence and patio area appended to Lot 1, we reverse and remand the chancery court's finding that there was no

9

trespass for further proceedings in accordance with this opinion.

## I. The possession of the land was not open, notorious, and visible.

¶37.    For a generation we have approached whether ownership was "open, notorious, and visible" by stating "[a]n adverse possessor must unfurl his flag on the land, *and keep it flying*, so that the actual owner may see, and if he will, that an enemy has invaded his domains, and planted the standard of conquest." *Id*. at (¶17) (emphasis added) (internal quotation mark omitted).  In this case, we are primarily concerned with whether Rose and the title owners of Lot 1 kept their flag flying over the patch of land on Lot 2.

¶38.    The undisputed testimony at trial shows that even if Rose had openly invaded the land, she retreated in 2012.  She clearly ceded the territory when the police were called out to resolve the fence-line dispute at the time of the memorial service for Mrs. Purvis.  Rickey called 911 because the nephew of Laurie Pannell, who lived in the house with Rose on Lot 1, "was parked on the edge of the fence where the fence is now."

¶39.    As Rose explained in her direct examination, when the police arrived, even though she said "it's my property," she asked Laurie's nephew "to move it anyway, so he moved his car."  This one undisputed fact shows conclusively that Rose and the title owners of Lot 1 retreated from the area in dispute.

¶40.    Nor was this a stray remark in the testimony—it was repeatedly nailed down at trial and also on appeal.  The testimony was elicited from Rose herself during her direct examination; through questioning, her lawyer had her repeatedly confirm that the 2012 call to law enforcement was an interruption in possession.  Acknowledging his client's retreat

10

from the property when the police were called, her lawyer then asked her, "*Other than that*, [have] there been any other disputes?" Rose then described other clashes with the law that may or may not have happened within the ten-year period relevant to adverse possession.

¶41.    This led to a damning follow-up when Rose's lawyer asked, "So your use was not disputed, was uninterrupted from 2003 until in '16—*well, one in '12* and then in '16?" Rose's response was, "Yes, sir." By answering in the affirmative, Rose conceded that any invasion was not only halted in 2012, but pulled back. Even in the attempt to defend the finding of adverse possession, Ms. Williams emphasizes this point in her response brief: "When their mother passed in 2012, they brought her remains back to be buried, then they stopped by their mother's house, called the police on us (twice)."

¶42.    The chancery court found of the fourth element (continuity of possession) that "there was no testimony that anyone had interfered with their use during this time period." As set out above, the standard in this case is clear and convincing evidence, which "is such a high evidentiary standard that it surpasses even the standard of overwhelming weight of the evidence." *Matthews v. Whitney Bank*, No. 2018-CA-00447-COA, 2019 WL 4024795, at *6 (¶29) (Miss. Ct. App. Aug. 27, 2019). "As an appellate court, we must bear in mind this high standard in determining whether there is sufficient evidence to support the chancellor's findings." *Id*. (internal quotation marks omitted). While the chancery court applied the correct legal standard, its factual finding of "open, notorious, and visible" was manifestly wrong in light of the above testimony. The evidence at trial, including concessions by Rose

11

herself, showed that the use of the disputed property was interfered with at least in 2012.[4]

¶43.    Other important proof showed that the use of the strip of land by Rose and the owners of Lot 1 was not "open," such as who paid taxes on the land.  "In regard to a claim of adverse possession, payment of taxes is very important and strong evidence of a claim of title." *Warehousing*, 978 So. 2d at 688 (¶18) (internal quotation mark omitted); *Winters v. Billings*, No. 2017-CA-01347-COA, 2019 WL 192313, at \*3 (¶19) (Miss. Ct. App. Jan. 15, 2019) (considering "who paid taxes on the land" as "an important factor").

¶44.    Payment of taxes is a public and visible action demonstrating to others that the adverse possessor is claiming responsibility for the property and assuming an economic burden.  In the converse, it may show that the current landowner has little interest in maintaining the land.  This is why decades ago the Supreme Court made clear that paying taxes is in and "of itself . . . a potential fact in proof of a hostile assertion of title by the party paying the taxes." *McCaughn v. Young*, 85 Miss. 277, 37 So. 839, 842 (1905).  That case also quoted a United

---

[4] The elements of adverse possession can overlap, and the facts under this element also go to the requirement that the possession be "peaceful."  Use of the property in dispute must be peaceful, or a claim for adverse possession will be defeated.  *See Biddix v. McConnell*, 911 So. 2d 468, 477 (¶25) (Miss. 2005) (defining "peaceful" as "marked by, conducive to, or enjoying peace, quiet, or calm" under the parallel requirements for a prescriptive easement).  Peaceful does not mean there was never any dispute at all because "[s]imple disputes often arise between neighboring landowners, but do not rise to the level of destroying the peaceful existence between them."  *Hill v. Johnson*, 27 So. 3d 426, 432 (¶29) (Miss. Ct. App. 2009).

In this case, the uncontested proof was that Rickey called 911 in 2012 when a car was over the property line, after which an officer arrived at the property.  This invocation of legal authority surpasses what the Supreme Court found was a disruption of "peace, quiet, or calm" in *Biddix*, when a property owner battling a golf course was "picking up the out-of-bounds markers and throwing them back onto the course and also painting over the white lines put on his property by the golf course with green spray paint."  *Biddix*, 911 So. 2d at 477 (¶25).

States Supreme Court case that held paying taxes "is very important and strong evidence of a claim of title; and the failure of the plaintiff's predecessors to make any claim to the lot, or to pay the taxes themselves, is some evidence of an abandonment of any right in or claim to the property." *Id*. (quoting *Holtzman v. Douglas*, 168 U.S. 278, 284 (1897)); *accord Roberts v. Young's Creek Inv. Inc.*, 118 So. 3d 665, 671 (¶13) (Miss. Ct. App. 2013) (The action of an adverse possessor in "renting the land to the Department of Agriculture" helped show its "possessory acts were open, notorious, and visible.").

¶45. The evidence at trial was undisputed that it was only ever the Purvis family who paid taxes on Lot 2. Rose admitted she had never paid taxes on the land. This further goes to demonstrate that the use of Lot 2 by Rose was not open, notorious, and visible.

¶46. To obtain property by adverse possession, a party must meet every single element by clear and convincing proof, and when any element is missing adverse possession cannot be granted. *Orcutt v. Chambliss*, 243 So. 3d 757, 762 (¶15) (Miss. Ct. App. 2018) (requirement "to prove *each* element by clear and convincing evidence") (emphasis added). Because this element was not met, we reverse and render the finding of adverse possession.

## II. The use of the land was not hostile to the ownership of the Purvises.

¶47. Another element necessary to prove adverse possession requires a determination if the use of the property was "actual or hostile." When a person has permission to use land, their use is not hostile for purposes of adverse possession. "Permission, once given, will not ripen to adverse possession." *Burns v. Haynes*, 913 So. 2d 424, 429 (¶13) (Miss. Ct. App. 2005). This is because "[u]se by express or implied permission or license, no matter how long

13

continued, cannot ripen . . . since adverse use is lacking." *Id*. The Supreme Court has held that when possession of land "was inexplicably intermittent, or alternated with use by the true owner," this cannot establish adverse possession. *Blankinship v. Payton*, 605 So. 2d 817, 820 (Miss. 1992).

¶48. Rose's own testimony at trial repeatedly described how she had sought permission from Mrs. Purvis and Dianne before entering or doing any work on Lot 2. Permission was sought and granted for Rose to enter the land in the disputed area. In Dianne's recollection, Rose specifically asked for permission to weed-eat "around that old dog pen fence." Rose agreed she had asked for permission. Regardless of what was discussed, it is undisputed that at this time Rose bulldozed the land in dispute and then erected a new fence along the old dog pen. As Ms. Edwards argued pro se on appeal, "If she had acted as if she owned it, she would not have asked."

¶49. Plus this was not the only time Rose entered the land with permission; her testimony was that she always asked for permission: "I do not just go over there without being asked." This testimony may have been intended a shield against the trespass action, yet was elicited during the same trial.

¶50. In accord with *Burns*, the permissive use of the disputed area of land, and permission sought by Rose from Dianne before she entered it to clear it, defeats the claim of adverse possession. *See also Neal v. Newburger Co.*, 154 Miss. 691, 123 So. 861, 864 (1929) (When a party sent a letter "asking permission to remain on the property and use it," the Supreme Court found it was "strongly persuasive that the possession of appellant and her predecessors

in title had never been under claim of right.").[5]  The failure to prove this element also requires reversal.

¶51.    On appeal, Ms. Williams also raises the argument that the patch of land was not adversely possessed for the required ten-year stretch.  Rose testified that she put up the fence to enclose the disputed area of land when she landscaped in early 2013.  Dianne's recollection is that she found out about the fence when she came back home for her mother's memorial in late 2012.  Our resolution of this case on the two elements above does not require us to resolve this issue.  We note that the Legislature has created a safety valve for cases just like this one to preempt or soften litigation.  A person claiming adverse possession cannot take when "a landowner upon whose property a fence or driveway has been built who files with the chancery clerk within the ten (10) years required by this section a written notice that such fence or driveway is built without the permission of the landowner."  Miss. Code Ann. § 15-1-13(2) (Rev. 2019).  Had that provision been utilized by Mrs. Purvis or either of her children, they could have possibly avoided much of this litigation.

### III.    The resolution of the trespass action requires remand.

¶52.    On appeal, Ms. Edwards claimed that trespass to the land was proved and outside the

---

[5] This conclusion is further supported by the fact that Rose readily disclosed an attempt to purchase the whole of Lot 2.  "A willingness to negotiate with another potential claimant can be relevant to whether the possession has been hostile under a claim of right." *Lynn v. Soterra Inc.*, 802 So. 2d 162, 169 (¶23) (Miss. Ct. App. 2001).  The bare presence of a negotiation for purchase is not conclusive since "a willingness to negotiate also reveals a desire to compromise differences and avoid needless litigation;" the chancery court in *Lynn* ultimately excluded a discussion of this type.  *Id*.  In this case it was freely discussed at trial.  In Rose's recollection, Dianne called her to ask "if I was interested in buying her property, which was the trailer, that old school building, and Lot 2 and 3, whatever she owned."  Rose responded "yes, I would be interested in buying it."

scope of the permission granted by Dianne to enter the property.

¶53. "A trespass to land is committed when a person intentionally invades the land of another without a license or other right." *Reeves v. Meridian S. Ry. LLC*, 61 So. 3d 964, 968 (¶19) (Miss. Ct. App. 2011). "Trespass can be committed by, among other acts, placing an object on the other person's land," such as a fence or a wall. *Id*. "A trespass is committed even if the trespasser has a good-faith belief that he has a right to enter the land." *Id*. "[E]ven if he fails to show any actual damages," our law allows that a "the landowner may recover nominal damages," in order to safeguard the right of property. *Id*.

¶54. Because we reverse the finding of adverse possession, we must necessarily reverse and remand the claim for trespass. By the express implication of this decision, the fence and patio erected extends into Lot 2, which is owned by Ms. Edwards. This is inherently a trespass and must be halted. Whether nominal or actual damages should be awarded is for the chancery court to resolve after proceedings consistent with this opinion and in accord with our law on trespass.

**CONCLUSION**

¶55. Because all of the elements were not met, we reverse and render the determination that the strip of Lot 2 was adversely possessed. We reverse and remand the claim for trespass for further consideration by the chancery court in light of this ruling.

¶56. **REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

16